**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**UNITED STATES OF AMERICA,**

      **PLAINTIFF,**

                                      **Case No. 2:05-cr-169**
**v.**                                      **JUDGE GREGORY L. FROST**

**ERIC L. WATERFIELD,**

      **DEFENDANT.**

### ORDER

This matter came on for a hearing this 4th day of May 2006 upon the Motion to Suppress Evidence (Doc. # 16) filed by Defendant on February 15, 2006, the Reply (Doc. # 22) filed by the Government on April 5, 2006, and upon the post-hearing briefs filed by the Defendant (Doc. #27) on May 15, 2006 and by the Government (Doc. # 28) on May 16, 2006.  Defendant claims that the marijuana plants that form the basis of the charges filed against him should be suppressed because the seizure was the product of violations of Defendant's rights as guaranteed by the Fourth Amendment to the United States Constitution.

**I.**      **FACTS**

At the hearing, the Government called Jackie Keaton as its first witness.  Mr. Keaton is an Ohio Department of Transportation pilot and has flown helicopters for thirty-two years.  He assists the Ohio Bureau of Criminal Identification and Investigation in the ERAD program designed to identify and eradicate marijuana plants in Ohio counties.  On July 13, 2004 Mr. Keaton was operating a helicopter in the Delaware County, Ohio area and a spotter, Dennis Lowe, was with him.  Mr. Lowe is the main spotter for the ERAD program and is employed by the Ohio Bureau of Criminal Identification and Investigation.  The two had flown together for

more than ten years. Mr. Keaton testified that pursuant to Federal Aviation Regulations, Part 91, helicopters must fly at a minimum height of 300 feet in case of engine failure. At that height, if the helicopter experiences engine failure, the helicopter can auto-rotate and land safely. If a helicopter is operated lower than 300 feet, auto-rotation will not be effective, resulting in a crash landing. Mr. Keaton also testified that generally all aircraft are required to fly at 500 feet above any person, vessel, or structure, but helicopters are permitted to fly at lower altitudes so long as due regard is given to the safety of persons on the ground. Keaton estimated that the surveillance on July 13, 2004 was conducted at an altitude of generally 400 feet but not any lower than 300 feet because of safety concerns. Mr. Keaton conceded that they may have flown below 300 feet on one occasion that day.

  The pilot testified that the spotter initially identified one marijuana plant on property northwest of Defendant's property. The ground crew was dispatched to the area and the plant was destroyed. More marijuana plants were spotted by Lowe in that general vicinity northwest of Defendant's property. The pilot indicated that he and the spotter noticed a vehicle trail leading from the location where the marijuana plants were found on the adjacent property to the Defendant's property. After that identification, the pilot then circled around and the spotter located more marijuana plants southwest of Defendant's property. Again, the pilot and the spotter observed more vehicle trails leading back to Defendant's property.

  Based upon those observations, Mr. Keaton flew over Defendant's property and spotted marijuana plants on Defendant's property. They also spotted greenhouses on the property. It was at this time that the helicopter flew lower and possibly below 300 feet in order to observe what the spotter believed to be small marijuana plants growing in pots outside and adjacent to

the greenhouses.  Thereafter, the helicopter traveled to the other side of the road adjacent to Defendant's property, and the spotter identified marijuana plants in a swampy area near the river.

Mr. Keaton indicated that the helicopter was in the area circling over the properties for about one hour.  During that time, the pilot believed that people on the ground would have been able to see and hear the helicopter.  He also believed that the down draft from the helicopter rotor blades would have caused tree leaves and limbs to sway, especially when the helicopter was hovering.  The helicopter received permission to land on some private property in the vicinity, and the ground crew were then directed onto Defendant's property.  The ground crew did not enter onto Defendant's property until after the helicopter spotter identified marijuana plants were identified on Defendant's property by the helicopter spotter.

Dennis Lowe, the spotter in the helicopter, was called as a witness.  He testified that he was employed as a special agent with the Ohio Bureau of Criminal Identification and Investigation for nine years and as a police officer for more than twenty years.  Since 1992 Officer Lowe has been assigned in the summer months to work as a spotter in a helicopter for the marijuana eradication program.  He was initially trained to work with the National Guard in eradication programs.  He was taught how to look for the plant and structures, as well as different things in nature that would not typically be there.  Between July and October of every year, Officer Lowe flies every day except weekends to spot marijuana.  He does not use binoculars because of the constant movement of the aircraft.

The witness confirmed that on July 13, 2004 he initially saw one marijuana plant in a field and then spotted several marijuana plants in another area northwest of Defendant's house. As a result of finding those plants, the helicopter search was expanded and more marijuana

3

plants and containers were identified by Lowe in an area southwest of Defendant's property. Vehicle trails from both the northwest area and the southwest area led to the Defendant's property. The helicopter followed the trails to Defendant's property and marijuana plants were observed by Lowe on Defendant's property. Greenhouses used for growing plants were identified on Defendant's property, as well as a four-wheel vehicle that was consistent with the type of vehicle that would leave tracks seen leading to the two other areas off of Defendant's property. After identifying marijuana plants on Defendant's property, the spotter then observed marijuana plants across the roadway from Defendant's property in a swampy area.

The officer testified that he believed that the helicopter was flying at an altitude of between 400 and 500 feet. When questioned as to how he could spot marijuana plants from that height, Officer Lowe indicated that it is typically not the plant itself but a combination of identifiers such as disturbed earth around the base of the plants, the shape and color of the plants, and sometimes containers in which young plants are grown.

Detective John Radabaugh of the Delaware Police Department testified that he was advised by the spotter, Dennis Lowe, that marijuana plants had been observed on Defendant's property. Detective Radabaugh and several other law enforcement personnel then proceeded to Defendant's property. The officers walked onto the premises and observed marijuana growing in containers on the bus and van parked on the property, in plastic containers hanging from the trees, in the ground, in the greenhouses, and in containers outside one greenhouse. The officers also observed a four-wheel all-terrain vehicle equipped with a spraying attachment, hoses leading to various parts of the property, and fertilizer. The ground crew collected and photographed all of the marijuana plants and the paraphernalia believed to be used to grow the

plants.  The officers also went across the road from Defendant's property into a swampy area and identified and collected more marijuana plants growing in that area.

During the initial one and one-half hours that the officers were on Defendant's property, neither Defendant nor any other residents were at the property.  Detective Radabaugh testified that during that period of time the officers collected the marijuana plants on the property to prevent destruction of the evidence.  Thereafter, an affidavit for a search warrant was prepared and submitted to Judge Krueger of the Delaware County Common Pleas Court.  Judge Krueger issued a search warrant for the search of the residence, garage, and other outbuildings.  Officers eventually searched the residence and other buildings on the property pursuant to the search warrant.  A total of approximately four hours elapsed from the time the officers entered onto the property until the search of the buildings and the residence occurred.

In all, a total of 2,437 marijuana plants were confiscated:  744 marijuana plants from the trail on the back of Defendant's property; 649 plants from the yard behind the house; 57 plants from the rear of the detached garage; 22 plants from a tall shrub area on the property; and 769 marijuana plants from the greenhouse area on the property.  According to Detective Radabaugh, the greenhouses were open and the interior of the greenhouses were readily observable when standing outside of the greenhouses.  Marijuana plants were collected from the greenhouses before the search warrant was obtained.  After receiving the search warrant, an additional 342 plants were found in the detached garage.  Paperwork and firearms were recovered from inside the Defendant's house.  The parties stipulated that the marijuana plants found in the fields northwest, southwest, and across the roadway from Defendant's property were not located on property owned or leased by Defendant or any member of Defendant's family.

Eric Griffin, a detective with the Delaware Sheriff's Office, also testified on behalf of the Government. As a member of the ground crew he went onto Defendant's property after they had been alerted to marijuana on the property. He testified that all plants collected before the search warrant was obtained were in plain view. Detective Griffin did observe a deck and hot tub in the back of the house but he did not testify that marijuana plants were confiscated from that area.

Patricia Ann Downing, a neighbor of Defendant, testified on behalf of Defendant. She is a nurse working in the Columbus, Ohio area. She works at night and is at home during the daytime. She testified that on July 13, 2004 a helicopter woke her up and that she observed the aircraft flying in the vicinity of her home. She indicated that the helicopter was loud and appeared to be flying lower than the helicopter medical flights she occasionally would see flying over the residence.

Defendant then called as an expert witness Scott Noll, who is a technical consultant for SEA, a firm that provides expertise to litigants and attorneys. Mr. Noll's area of expertise generally involves forensic investigations relating to traffic accident reconstruction and specifically the area of human perception and visual acuity. The expert testified that from the experiments and calculations that he performed, he did not believe a person flying over 100 feet above the ground would be able to resolve details on the ground sufficiently to identify an object the size of a marijuana plant.

Evidence was admitted and the matter was taken under advisement.

## II.    DISCUSSION OF APPLICABLE LAW

### A.  Helicopter Surveillance

A plurality of the United States Supreme Court in *Florida v. Riley*, 488 U.S. 445 (1989)

concluded that the Fourth Amendment does not require the police traveling in the public airways at an altitude of 400 feet to obtain a warrant to observe what is visible to the naked eye.  An individual can not reasonably expect that marijuana plants growing in open fields behind an individual's house would be free from public observation.  In dicta, the plurality also observed that no intimate details connected with the use of the home or curtilage were observed during the surveillance, and there was no undue noise and no wind, dust, or threat of injury.

Justice O'Connor, concurring only in the judgment, concluded that the plurality's approach rested too heavily on compliance with FAA regulations in its determination of whether a defendant had a reasonable expectation of privacy from aerial observation of the curtilage.  She stated that the more appropriate question to ask was whether a defendant's expectation of privacy was one that society was prepared to recognize as reasonable.  Justice O'Connor suggested that in a helicopter surveillance case, the court should evaluate reasonableness by asking whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity.

In applying *Riley*, the Sixth Circuit has similarly concluded that the assessment of an individual's reasonable expectation of privacy depends on how readily observable the marijuana was from above, the precautions taken by a defendant to protect his property from aerial inspection, the frequency of helicopter flights in the area, the height of the helicopter, and any disturbance caused by the helicopter's flight.  *United States v. Saltzman*, 992 F.2d 1218, 1993 WL 100082, at *1 (6th Cir. 1993) (unpublished table decision).  With regard to the altitude of the helicopter, a court specifically noted that "[i]f, in fact, the officers were flying at an altitude of 125 to 150 feet, their disturbance of the home *would* interfere with the defendant's normal use of

7

his premises." *Id.* at *3 (emphasis added).

That the helicopter may have been flying contrary to regulation is not dispositive in this case. In *Riley* itself, the helicopter was flying contrary to regulation, but the evidence obtained was not suppressed. Although the *Riley* plurality relied on FAA regulations in part, they were used only as a means to demonstrate that flying at 400 feet was common enough that the respondent could not have reasonably anticipated that his greenhouse would not be observed from that altitude.

It is also worth noting that in *Riley*, the observation of the marijuana plants was made over the curtilage of the home –  more specifically into the interior of a partially covered greenhouse within the curtilage. If a helicopter is flying over open fields contrary to regulation, even with undue noise, wind, or dust from the helicopter, the helicopter surveillance is unlikely to be considered a "search" for Fourth Amendment purposes. *See e.g., Oliver v. United States*, 466 U.S. 170 (1984) (holding that because individuals do not have a legitimate expectation of privacy in activities occurring in open fields, searching an open field is not a "search" for fourth Amendment purposes).

Using the *Saltzman* factors, this Court is convinced that the helicopter surveillance was reasonable, proper, and did not interfere with Defendant's Fourth Amendment rights. The marijuana plants, with the exception of the small plants located beside a greenhouse, were readily observable from the 300-400 feet altitude flown by the helicopter. Although the Court was initially skeptical that a spotter could locate marijuana plants from that altitude, the testimony of the spotter was credible. This is true despite the testimony of Defendant's expert. Dennis Lowe's testimony convinced this Court that helicopter surveillance between 300-400 feet

can produce reliable results if the spotter is experienced and well trained.

The plants were, for the most part, not covered, and Defendant apparently did not try to camouflage or hide the plants, which would have been a herculean task given the large number of plants on Defendant's property. They were growing on trees, on the van and bus in the backyard, and beside one of the greenhouses.

There was little testimony concerning the frequency of helicopter flights over the area in question, although Ms. Downing did relate to the Court that the life flight helicopter occasionally flew over the property. Only one helicopter was used to conduct this surveillance, and the surveillance lasted approximately one hour.

The testimony indicated that the helicopter flew at an altitude of between 300-500 feet, with 300-400 feet being the usual altitude when attempting to spot marijuana plants. Federal Aviation Administration regulations apparently permit a helicopter to fly lower then 500 feet so long as due regard is given to the safety of people on the ground. The pilot was adamant that below 300 feet is not safe for the occupants of the helicopter, and he testified that he attempts to maintain an altitude of 300 feet or higher absent exigent circumstances. On only one occasion on July 13, 2004 did the pilot fly below the 300 foot level and that was to view the greenhouse area closer. His testimony indicated that he was only thirty to fifty feet below the 300-foot altitude. At no time was the helicopter below an altitude of 250 feet on that one occasion.

The helicopter did create a disturbance to Ms. Downing. She indicates that it was loud and woke her up. There was no testimony from any other people in the area, and the Defendant nor anyone else was at Defendant's residence at the time. The pilot indicated that the leaves and branches would sway as a result of the downdraft created by the helicopter. However, no one

testified to any limbs being blown off trees or any damage to property.

On balance this Court finds that the helicopter surveillance was reasonable, that it was minimally intrusive given the general nature of helicopter fly-overs, and that it was conducted at an altitude at which members of the public flying in helicopters travel with regularity. No intimate details connected with the use of the home or curtilage were observed during the surveillance, and there was no undue noise, wind, dust, or threat of injury. Under the circumstances, Defendant's expectation of privacy is not one that this Court is prepared to recognize as reasonable.

### B. Entry onto Defendant's Property

Under Fourth Amendment jurisprudence, searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable, subject to a few delineated exceptions. *Payton v. New York*, 445 U.S. 573, 586 (1980). The Supreme Court has recognized that entry without a warrant is permissible under certain circumstances, such as in order to prevent the imminent destruction of evidence or to prevent a suspect's escape. *See, e.g. Minnesota v. Olson*; 495 U.S. 91, 100 (1990), *Warden v. Hayden*, 387 U.S. 294, 299(1967).

Police officers may also restrict a suspect from entering his residence without accompaniment while officers obtain a search warrant for the residence. *Illinois v. McArthur*, 531 U.S. 326, 331-32 (2001). Applying the competing "reasonableness" view of the Fourth Amendment, the Court in *McArthur* balanced the privacy-related concerns of the defendant with the law enforcement-related concerns to conclude that it was reasonable for the police to seize the defendant for a temporary period of time to prevent destruction of evidence. *Id.* at 331. Specifically, the Court considered four factors that counseled in favor of the temporary seizure

of the defendant.  The Court finds that the factors to be somewhat analogous to this matter.  First, the police had *probable cause* to believe that the defendant's trailer home contained evidence of a crime and unlawful drugs.  *Id.* at 331-32.  Second, the police had good reason to fear that, unless restrained, the defendant would *destroy the drugs* before they could return with a warrant. *Id.* at 332.  Third, the police made *reasonable efforts* to reconcile their law enforcement needs with the demands of personal privacy.  *Id.*  The officers "neither searched the trailer nor arrested the defendant before obtaining a warrant.  Rather, they imposed a significantly less restrictive restraint, preventing the defendant only from entering the trailer unaccompanied."  *Id.*  Finally, the police imposed the restraint for a *limited period of time*, namely, two hours.  The trial court concluded that "this time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant."  *Id.*  The Court's conclusion that the brief seizure of the defendant and premises were permissible was also supported by prior case law.  *See, e.g., Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (exigent circumstances do not justify search where police guard at door could prevent loss of evidence).

In the case *sub judice*, the Court finds that the law enforcement ground crew legally entered onto Defendant's property and lawfully remained there until the search warrant was obtained.  The officers, as a result of the helicopter surveillance, had more than sufficient probable cause to believe that contraband was on Defendant's property.  From the air marijuana was seen throughout the yard, trees, and open areas.  When the officers entered onto the property, they had no knowledge of whether any person was in the house or elsewhere on the property.  This Court is also convinced that the ground crew undertook reasonable efforts to reconcile enforcement needs with the individual's demands of privacy.  The officers did not

11

enter the residence. They did not enter into the outbuildings, and they did not search the garage. Not until a search warrant was obtained did the officers enter and search the buildings on the property.

Defendant argues that the elapsed time from the initial observation of the marijuana plants, which was approximately 3:30 p.m. until the search warrant was obtained from Judge Krueger was far too long to justify the argument that the officers remained on the premises lawfully. As explained more fully in the next section, the officers were permitted to seize that which was in plain view once they lawfully entered onto the premises, and the large quantity of plants in plain view provides a reasonable and satisfactory answer to Defendant's argument. It took some time to simply collect and catalog all of the plants growing in plain view. Defendant argues that officers could have stood guard over the property searched while a search warrant was obtained. Although the procedure proposed by Defendant certainly would have been proper, once legally on the premises as the officers were, there is nothing preventing them from collecting contraband in plain view.

### C. Open Fields and Plain View

Open fields are not protected by the Fourth Amendment, even if an individual attempts to safeguard his privacy in an open field by erecting fences and "No Trespassing" signs. *Oliver v. United States*, 466 U.S. 170, 182 (1984). However, the area immediately surrounding the home–the–curtilage–is protected. *Id.* at 178; *United States v. Dunn*, 480 U.S. 294, 300 (1987). In determining whether an area outside of the home is protected as curtilage, or unprotected as an open field, the central inquiry is whether the area harbors the intimate activity associated with the sanctity of an individual's home. *Id.* Generally, four factors are considered in this analysis.

> [1] the proximity of the area claimed to be curtilage to the home; [2] whether the area is included within an enclosure surrounding the house: [3] the nature of the uses to which the area is put; and [4] the steps taken by the resident to protect the area from observation by people passing by.

*Dunn*, 480 U.S. at 301. These factors are only relevant to the extent that they indicate whether an area is so intimately tied to the home that it deserves Fourth Amendment protection.

As to the first factor, all the areas of Defendant's property searched without a warrant were sufficiently distant from the residence for this Court to find that the areas were not within the curtilage. In evaluating the proximity factor, courts have concluded that the proximity of the area to the home must be considered with regard to the other *Dunn* factors, so that proximity is not decisive. *See, e.g. Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598-99 (6th Cir. 1998) (a distance of 50 to 60 yards was "inconclusive" by itself); *United States v. Diehl*, 276 F.3d 32, 39 (1st Cir. 2002) (an 83-foot distance was not "decisive" in curtilage determination); *United States v. Breza*, 308 F.3D 408, 436 (4th Cir. 2002) (a distance of 50 feet between a house and the area in question did not require a finding that the area was in the curtilage).

In the instant case, the area searched around the garage was at least thirty-three feet from the home, and the greenhouse was at least eighty feet from the home. The area where agent Lowe observed the plants on Defendant's property was west of the greenhouse near the back of the property line. The distances involved were sufficiently distant from the home and the fact that the area west of the greenhouse was being used solely to grow marijuana compels this Court to find that those areas are open fields and subject to Fourth Amendment protection. As with most marijuana cultivation operations there was evidence of human activity in the area of the growing marijuana plants. This does not make the area curtilage. The fences and trees cited by Defendant do not obstruct the view of the back yard and the out buildings. (Exhibits 1-I, U, 3-B, G.) The

13

plants outside of the greenhouse and inside the greenhouse were in plain view. The greenhouses like the ones in *United States v. Van Damme*, 48 F.3d 461 ( 9th Cir. 1995) were easily viewed from the outside. (Exhibit 1-K.) Plants on the outside of the greenhouse, that had been spotted from the air (Exhibit 2-C), were in plain view of the officers on the ground. (Exhibit 1-N).

There is no question that the officers entered the property by walking up the driveway and across the property to area where the plants had been spotted. The Court in *United States v. Oliver*, 466 U.S. 170 (1984) held that police may enter open fields, even through private property, despite the fact that the fences are not visible from any point of public access. That the officers crossed part of the property where Defendant resides is not a basis for suppression of the warrantless search.

The Court will not suppress the contraband seized during the warrantless open field search. Although open field observation does not automatically give the Government the right to seize contraband, it does not prohibit the Government from applying other well-established constitutional doctrines to the situation–namely the warrantless seizure of items in plain view. In this case, the officers initially entered the property to guarantee that no one present would destroy the evidence.

The plain view doctrine allows the warrantless seizure of items in plain view so long as (1) the officer does not violate the Fourth Amendment in arriving at the place from which evidence can be plainly viewed; (2) the incriminating nature of the item is immediately apparent; and (3) the officer has a lawful right of access to the object. *United States v. Frederick*, 152 Fed. Appx. 470, 472 (6th Cir. 2005) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). Specifically, the warrantless seizure of evidence in plain view is not prohibited by the Fourth

14

Amendment, even when the discovery is not inadvertent. *Horton*, 496 U.S. at 130. Because an open field search is a search conducted from a lawful vantage point, evidence need only be immediately apparent as incriminating in order to be seized without a warrant. *See, e.g., United States v. Raines*, 243 F.3d 419,422 (8th Cir. 2001) (noting that the plain view doctrine would have permitted an officer to seize marijuana plants in a defendant's backyard without a warrant because the officer's training and expertise made the incriminating nature of the plants immediately apparent).

Defendant has cited the case *United States v. Jenkins*, 124 F.3d 768 (6th Cir. 1997) for the proposition that all evidence should be suppressed as a result of the officers crossing into the Defendant's backyard. In the *Jenkins,* case the officers disregarded the instructions of the property owner and crossed through the backyard to get to a gate. While in the backyard they saw evidence that they had never seen before. The facts in this case are different. Officers had observed the marijuana on the property where Defendant resided had been observed before officers entered the property. As officers proceeded to area where the marijuana had been spotted, they observed marijuana in plain view hanging in the trees, on top on the van, and outside as well as inside of the greenhouse. The Court in *Jenkins* stated:

> We do not mean to suggest that because defendants' backyard is within the curtilage of the house, it receives protection from all police observation. The protection extended to a house by the Fourth Amendment does not require police officers to shield their eyes when passing on a public concourse. *California v. Ciraola*, 476 U.S. 207, 213, 106 S.Ct. 1809, 1812-13, 90 L.Ed.2d 210 (1986); *see also Florida v. Riley*, 488 U.S. 445, 449-50, 109 S.Ct. 693, 696-97, 102 L.Ed.2d 835 (1989 plurality opinion). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."
> *774 *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) (citation omitted). Visual inspection for a lawful vantage point, however, is quite different from the physical assault on defendants' backyard that occurred in this case. *See Riley*, 488 U.S. at 449, 452, 109 S.Ct. At 696, 697 (plurality

opinion) (distinguishing lawful visual inspection of curtilage from physical invasion.

In the present case, all of the evidence seized without a warrant was seized only after a plain view observation conducted from a lawful vantage point while conducting an open field search. Therefore, pursuant to the plain view doctrine, the Court will not suppress the evidence seized from open fields without a warrant.

### D. Standing

With respect to those marijuana plants that were seized from adjoining property, Defendant does not have the standing to challenge the legality of the search of that property. It is axiomatic that a person does not have standing to challenge the legality of a search unless he has a reasonable expectation of privacy in the place so searched. *Rakas v. Illinois*, 439 U.S. 128 (1978). The burden of production and persuasion on the issue of standing rests on the person seeking to suppress evidence. *See United States v. Smith,* 783 F2d 648, 650 (6th Cir. 1986) (defendant failed to show that he had reasonable expectation of privacy in the basement of a house belonging to another person, and, thus, standing to contest its search, in the absence of proof that he had a property or possessory interest in that house). Defendant presented absolutely no evidence that he had any type of property or possessory interest in the land belonging to his neighbors; therefore, he did not have a reasonable expectation of privacy in those lands and does not have standing to challenge the legality of their search. Accordingly, the Court will not suppress the marijuana plants found northwest and southwest of Defendant's property as well as the plants found across the road in the swampy area.

### III.    CONCLUSION

The aerial surveillance of Defendant's property was reasonable and did not violate Defendant's expectation of privacy in the property.  The law enforcement personnel had the right to enter onto Defendant's property to prevent the destruction of the marijuana plants.  Once lawfully on the premises, the officers conducted an open field search and confiscated marijuana plants found in plain view.  Defendant does not have standing to contest the seizure of marijuana plants confiscated on property not owned by Defendant.  The Court **DENIES** the Motion to Suppress. (Doc. # 16)

**IT IS SO ORDERED.**

    /s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE